Filed 1/28/19; part. pub order 2/15/19 (see end of opn.)
Opinion following transfer from Supreme Court

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C078623 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F07431) |
| v. | OPINION ON TRANSFER |
| CORNELIUS L. JONES, | |
| Defendant and Appellant. | |

Defendant Cornelius L. Jones appeals from his conviction of attempted premeditated murder, assault with a deadly weapon, and assault likely to produce great bodily injury. He contends (1) the trial court erred by ruling the prosecution did not unconstitutionally excuse the sole potential African-American juror on the basis of race; (2) insufficient evidence supports the jury's finding he attempted to kill willfully,

1

deliberately, and with premeditation; (3) the court imposed an unauthorized sentence; and (4) the court committed other sentencing and clerical errors.

The California Supreme Court directed us to vacate our earlier opinion in this matter and reconsider the cause in light of Senate Bill No. 1393 (Stats. 2018, ch. 1013) (SB 1393). Thus, defendant also contends (5) we should remand to allow the trial court to exercise its new discretion under SB 1393 to strike two five-year enhancements imposed for a serious felony prior.

Except to remand to correct the sentencing and clerical errors, but not to reconsider the felony prior enhancements, we affirm the judgment.

## FACTS

Daniel Petty was the bartender and closing manager at a bar in Sacramento. In the late night and early morning hours of August 17 and 18, 2013, Jovan Felix and a female companion came into the bar. Felix ordered a drink, but he did not like how Petty made it. Believing the drink could not be made differently, Petty offered to make a different drink or to pay for the drink he made. Felix wanted Petty to make the same drink over again. Petty asked a coworker, Scott Nguyen, to take care of Felix, and he went outside for a break.

Nguyen attempted to fix the drink for Felix, but Felix did not accept it. Nguyen offered to make a new drink, but Felix refused.

When Petty went outside, he sat with Joleen Esquivel, the bar's general manager. He told her what had happened. Then Felix came outside and was confrontational towards Petty. Esquivel introduced herself as the manager and asked how they could resolve the matter. Felix said his drink was not made properly and the bartenders would not remake it. At one point, he said, "This is how places get burned down." He walked away with his companion, still angry.

2

After closing the bar, Petty, Nguyen, another employee named Angelo Stowers, and disc jockey Aaron Jacobson left the building together. Stowers saw a man walking back and forth suspiciously. He followed the man around the corner and saw him speak with Felix. Stowers turned around immediately and told the coworkers they needed to "leave ASAP."

Nguyen saw the two men and heard one of them asked the other, "Are these the guys?" The other said, "Yes." The coworkers began to walk away when one of the men, defendant, hit Nguyen in the head from behind. Both men went to the ground. Stowers pulled defendant off of Nguyen and slammed or dropped him on the ground. Jacobson kicked defendant near his head. Defendant stood up and brandished a knife.

Stowers ran across the street. Defendant chased him and said he would get him. As Stowers reached the curb, he tripped. He caught himself against a wall and stayed on his feet. He turned around, and defendant was almost on top of him with the knife. He grabbed defendant's wrist that held the knife as defendant tried to stab him. Stowers began to fall and defendant stabbed him in the abdomen. Stowers pulled out a knife from his back pocket and slashed defendant across the face.

Petty, from about 36 feet away, saw the man who was chasing Stowers push Stowers in the back, causing him to trip over the curb. Stowers hit the ground. The man jumped on top of him, but Stowers got to his feet. Stowers said, "Hey, stop trying to stab me." The man attacking Stowers made multiple stabbing motions with a knife in his hand. Stowers made a move with his hand and the man let out a pained growl. He held his cheek and ran away. The man and Felix met in the middle of the street and took off running together.

Petty, Nguyen, and Jacobson went to Stowers's aid. Jacobson called 911 and reported that defendant and Felix drove off in a dark-colored GMC SUV. Nguyen discovered his tires had been slashed. Stowers underwent surgery for internal bleeding,

3

during which he lost his pulse for about 45 seconds and was revived with CPR and medication. The surgery was successful, and the wound required several dozen staples.

Police located a gray GMC Yukon parked in front of defendant's residence. Jacobson identified defendant in a photo lineup, but Stowers could not.

At some point after a police interview, defendant admitted he was at the scene of the crime.

The parties stipulated that a criminalist obtained a DNA sample from blood on the tip of Stowers's knife, and the DNA matched with defendant's DNA.

The parties also stipulated that a blood sample taken from Stowers at the hospital revealed a blood-alcohol level of approximately 0.14 percent, and a male weighing 232 pounds with a known alcohol concentration of 0.14 percent would have approximately eight to nine drink equivalents in his system at the time the sample was taken. A drink equivalent is one 12-ounce beer, one standard glass of wine, or one ounce of 80-proof alcohol.

Called by the defense, Stowers stated that after work the night of the stabbing, he had a complimentary drink while he and the others closed the bar. The drink was Wild Turkey 101, which was 101-proof alcohol, or 50.5 percent. The drink filled one-third of an eight-ounce glass. Stowers denied he was drunk that night.

VERDICT AND SENTENCE

A jury found defendant guilty of attempted murder which he committed willfully, deliberately, and with premeditation, assault with a deadly weapon, and assault by means of force likely to produce great bodily injury. (Pen. Code, §§ 664/187, subd. (a), 245, subd. (a)(1), (4); statutory section references that follow are to the Penal Code unless otherwise stated.) It also found true allegations that defendant personally inflicted great bodily injury in the attempted murder and the assault with a deadly weapon, and he

4

personally used a dangerous and deadly weapon in the attempted murder. (§§ 12022.7, subd. (a), 12022, subd. (b)(1).)

In a bifurcated proceeding, defendant admitted a prior conviction for attempted voluntary manslaughter, and the trial court determined the conviction qualified as a serious felony and a prior strike. (§§ 667, subds. (a), (b)-(i), 1192.7, subd. (c), 1170.12.)

The court sentenced defendant to state prison for a term of 22 years plus a consecutive 14 years to life, calculated as follows: on the attempted murder, seven years to life, doubled for the prior strike, plus one year for the personal use enhancement, three years for the great bodily injury enhancement, and five years for the serious felony prior; and the upper term of four years on the assault with force likely to produce great bodily injury, doubled for the prior strike, plus five years for the serious felony prior. The court imposed and stayed sentence on the assault with a deadly weapon conviction pursuant to section 654.

## DISCUSSION

## I

### Batson/Wheeler *Motion*

The prosecutor used a peremptory challenge to excuse the only African-American member of the jury venire. Defendant, who is African-American, challenged the prosecutor's action under *Batson/Wheeler*. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 96]; *People v. Wheeler* (1978) 22 Cal.3d 258.) The trial court denied the motion, finding the prosecutor did not excuse the prospective juror based on her race.

Defendant contends the trial court erred. He claims the prosecutor's reasons for removing the prospective juror were pretextual and based on erroneous facts, and she did not excuse non-African-American panelists who had similar characteristics. Defendant also claims the court did not make a sincere and reasoned evaluation of the prosecutor's reasons for striking the juror.

5

A.    *Background*

In response to voir dire from the trial court, prospective juror Ms. F. stated she worked for the Department of Corrections and Rehabilitation as a senior personnel specialist in the employee benefits unit.  Prior to working for the Department of Corrections and Rehabilitation, Ms. F. worked for the Franchise Tax Board doing payroll.

When the court questioned her about her son, the following colloquy ensued:

"Q.    . . . And then your son is an IT specialist?

"A.    Yes.  He works for Man Tech, and he has been with them for about maybe three and a half years, and that's a federally funded program.

"Q.    And so he has always enjoyed all the computer type work?

"A.    Yes.  I love it that he has to do that cause then he can help me with my computer.

"Q.    Does he help you with the computer?

"A.    Yes, uh huh.

"Q.    That's a good son?

"A.    Yeah, he is.  We've come a long way though.

"Q.    Come a long ways?

"A.    Yes.

"Q.    Let's talk about the long ways that he's come.  [¶]  What's been going on?

"A.    Well, it took him a while to stay focus [*sic*] in school.  I liked him to stay more focused in school, and so instead, he would listen to his friends and not to me.  And my mother said, you know, you keep talking to him, and I could tell by the eye contact, you are in his way.  So I didn't pay attention to that, I just stayed on and stayed on him.  And he finally went back to school and finished, and now he's an IT specialist.

"Q.    Which is a terrific story.  Did he ever have any brushes with the law at all, or just that he was more just not focused with school, and—

6

"A.    Not focused with school and getting tickets and driving without insurance, and parking in handicap spots, and stuff like that.

"Q.    So he got a talking to from time to time from Mom?

"A.    Yes."

Ms. F. stated she had been a juror on two previous cases.  The first case involved a civil lawsuit.  The second was for child endangerment, and the jury reached a verdict in that case.  The following exchange then occurred regarding a domestic abuse matter:

"A.    Back in '74, '75—1974, 1975, my brother-in-law, not my brother-in-law anymore, he, I guess, got into an argument at the apartment with my sister.  My parents woke me up and said, [daughter], go over there and find out what's going on, and so I did.  And before I made it there before the police, he was trying to throw my niece into the pool.  And at that time, she was a newborn, and now she is 38.

"Q.    Isn't that something?

"A.    Yes.

"Q.    And you were 17 or 18, if I recall?

"A.    Yes.

"Q.    And did you then sort of help come to the rescue on all that?

"A.    I tried to assist with the apartment manager, but the police were able to take over from that point.  And then they only arrested him for that night, and then he was released the next morning.

"Q.    Is that right?

"A.    He just didn't think.

"Q.    He is no longer your brother-in-law?

"A.    No, he's no longer."

The prosecutor used a peremptory challenge to excuse Ms. F.

Defense counsel objected under *Batson/Wheeler*.  Counsel argued, "We believe Ms. [F.] was the only prospective African[-]American juror that was available to either

side, and we believe that that falls within the parameters of Batson and Wheeler. [¶] We would also point out that I believe for—there were [*sic*] certainly no cause to let Ms. [F.] go as both sides had stipulated to her being at least considered. And we believe that my client being of African[-]American descent now falls squarely within the parameters of Batson and Wheeler."

The trial court confirmed Ms. F. was the only African-American member of the venire, and it found defendant had established a prima facie case that the prosecutor dismissed her due to group bias. Asked to explain her reasons for dismissing Ms. F., the prosecutor stated: "Three main factors. The first one of which she has a son who is the exact same age, one year apart from the defendant in this case, which obviously poses a concern for any type of bias or sympathy that could be on her part for the defendant throughout this trial.

"The second is that she had an incident in her background that involved her sister having domestic violence. In that case I think the Court had inquired with her [*sic*] she had gone up and sort of stepped in there, addressed the situation. Her response was that she went and got a manager—an apartment manager, I think is who it was, to come and help her with the situation.

"I had been questioning about self-defense, and I was curious to see what her response would be to that. If it would had [*sic*] been, which the People would have more—would have wanted that answer if she had gone in and stopped the scenario, and then call 911, or done something more in that regard.

"The third is looking at the—just the different personality traits on the jury as a whole and wanting to have someone, who is going to be of a different balance, if you will, between the leaders in the group as well as the individuals who are going to be more of each shee[p], if you will, in the group. And the goal would be to have more who were not going to be quite as—would take more of a leadership role essentially.

8

"So, the three main factors. I agree everything [*sic*] else that she was a good candidate. There were several things I liked about her, but the main thing would be that she has a son who is the exact same age, a year apart from the defendant."

The trial court concluded a *Batson*/*Wheeler* violation had not occurred. It stated, "Well, I certainly don't make no [*sic*] credibility determination to think that [the prosecutor] was using a revert [*sic*] racial motivation in her exercising a peremptory challenge. I think that we have a record here that would be ultimately reviewed. I don't think that we have a Batson-Wheeler violation such that—we don't have one, so I'm not going to begin anew the process of—that we are underway presently."

After the lunch recess, the prosecutor asked to augment the record with another reason why she excused Ms. F. She stated, "Part of my thought process and in exercising a challenge against Ms. [F.] was regarding her statement of her own son having his own obstacles. I think it's the way she had put it was it wasn't a criminal history, but when the Court inquired she said that her son had had, I believe, a long way to go before he got to where he is today as an IT specialist. He had tickets, and I think she said he had been driving without a license, but for her being able to stand in and essentially get him on track, she had a little bit of difficulty with him. And part of that—that was part of the concern that the People have about keeping Ms. [F.] on in light of these struggles she had with her son, and that's part of the fear I had about her thinking of her background with the son and having sympathy for the defendant, so I just wanted to augment the record, and thank you for letting me do that."

B. *Analysis*

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.' *Snyder v. Louisiana*, 552 U.S. 472, 478 [170 L.Ed.2d 175] (2008) (internal quotation marks omitted). [The Supreme Court's] decision in *Batson v.*

9

*Kentucky*[, *supra*, 476 U.S. 79], provides a three-step process for determining when a strike is discriminatory:

" 'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.' (*Snyder*[, *supra*, 552 U.S. at pp. 476-477] (internal quotation marks and brackets omitted)." (*Foster v. Chatman* (2016) __ U.S. __ [195 L.Ed.2d 1, 12].)

Where the court finds a prima facie case has been made, as the trial court did here, "the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone. The showing need not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses." (*People v. Wheeler, supra*, 22 Cal.3d. at pp. 281-282, fn. omitted.)

" 'The second step of this process does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." [Citation.]' (*Purkett* [*v. Elem* (1995) 514 U.S. 765,] 767-768 [131 L.Ed.2d 834].)" (*People v. Reynoso* (2003) 31 Cal.4th 903, 916.)

"The prosecutor's ' "justification need not support a challenge for *cause*, and even a 'trivial' reason, if genuine and neutral, will suffice." [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.' (*People v. Lenix* [(2008)] 44 Cal.4th [602,] 613.) 'The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the

10

race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons. . . . All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.' (*People v. Reynoso*[, *supra*,] 31 Cal.4th [at p.] 924.)" (*People v. O'Malley* (2016) 62 Cal.4th 944, 975, original italics.)

" ' "Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " ' [Citation.] 'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.' [Citation.]" (*People v. Hensley* (2014) 59 Cal.4th 788, 802-803.)

Substantial evidence supports the trial court's denial of defendant's *Batson/Wheeler* motion. It shows the prosecutor excused Ms. F. for genuine reasons unrelated to race. She feared Ms. F. would be sympathetic to defendant because defendant was similar in age to her son and her son had gone through a stage of committing anti-social behavior but, by her "staying" on him, had become a good son with a good career. The prosecutor also wanted more jurors who would take a leadership role, and she did not believe Ms. F. had that personality trait. These reasons are inherently plausible and are supported by the record.

Defendant claims the prosecutor's stated reasons are blatantly discriminatory. He relies on comparative juror analysis to make his argument. Fear of Ms. F.'s sympathy

11

was discriminatory, defendant argues, "because it shows the prosecutor believed an African-American parent of a young adult African-American male would view [defendant]—a young adult African-American male—through a biased lens, whereas no such concerns were expressed with regard to non African-American parents of non African-American young adult males." Besides Ms. F., two of the seated jurors had young adult sons (both aged 24), but the prosecutor did not question them about any difficulties they may have had with their sons or express concern that these jurors might be sympathetic towards defendant. The reason for this different treatment, defendant asserts, "can only be attributed to race."

We disagree. " '[I]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination.' [Citation.]" (*Foster v. Chatman, supra*, ___ U.S. at p. ___ [195 L.Ed.2d at p. 20].) However, "comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*People v. Lenix, supra*, 44 Cal.4th at p. 622.) "We recognize that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were *not* raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." (*Snyder v. Louisiana, supra*, 552 U.S. at p. 483, italics added.)

Here, the alleged similarities between Ms. F. and the other jurors were not raised at trial. Upon the court commenting that Ms. F.'s son was a good son, Ms. F., without prompting from the court, volunteered, "We've come a long way though." The court reasonably inquired as to what she meant. The other jurors with children of approximately defendant's age, Juror Nos. 10 and 12, did not volunteer any such information when the court asked about their children. Juror No. 10 had two children

ages 21 and 24. The younger daughter was a student at St. Mary's, and the older son was a graduate of the University of Southern California and worked as a media associate in Los Angeles. Juror No. 10 said nothing about difficulties with the children when they were growing up.

Juror No. 12 had a 24-year-old son who was working at Panera. The son lost his warehouse job and was looking for another one. It appeared to the court the son liked to be out doing things and did not want a desk job. The juror agreed. Like Juror No. 10, Juror No. 12 said nothing about having any difficulties with the son growing up.

Because no evidence at trial showed Juror Nos. 10 and 12's sons had any similar type of difficulties as Ms. F.'s son, there is no evidence before us on which we could conclude the three jurors were truly comparable. " 'It should be apparent, therefore, that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar . . . . It is therefore with good reason that we and the United States Supreme Court give great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose.' [Citation.]" (*People v. Reynoso, supra*, 31 Cal.4th at p. 919.)

Defendant also faults the prosecutor for relying on incorrect facts. The prosecutor stated defendant was the same age or one year apart from Ms. F.'s son, and that Ms. F.'s son had driven without a license. In fact, defendant at the time of trial was 36 years old; Ms. F.'s son was 29. Also, Ms. F. did not say her son drove without a license. She said he drove without insurance.

These misstatements, however, do not establish the prosecutor excused Ms. F. because of her race. The prosecutor was concerned about the sympathy Ms. F. would have towards defendant. The factual inaccuracies do not alter the prosecutor's thought process. Under either scenario, she could genuinely be concerned about Ms. F.'s

13

sympathy due to having a son of comparable age who made some mistakes growing up but became a productive citizen. We cannot infer from these facts the prosecutor dismissed Ms. F. due to her race.

Defendant argues the prosecutor's other arguments were pretextual. He claims the argument based on Ms. F.'s trying to assist the apartment manager instead of personally taking action when her uncle threatened to throw a newborn into a pool was reasonable given her age at the time. And Ms. F.'s purported lack of a leadership personality "is the sort of implausible or fantastical justification that rises to the level of pretext for purposeful discrimination."

Lacking traits for leadership or taking incentive is a type of hunch or idiosyncratic reason that the courts recognize as legitimate grounds for exercising a peremptory strike. "[P]eremptory challenges are not challenges for cause—they are *peremptory*. We have said that such challenges may be made on an 'apparently trivial' or 'highly speculative' basis. (*People v. Wheeler, supra*, 22 Cal.3d at p. 275.) Indeed, they may be made ' " without reason or for no reason, arbitrarily and capriciously" ' (*People v. Williams* (1997) 16 Cal.4th 635, 663)." (*People v. Jones* (1998) 17 Cal.4th 279, 294, original italics.) Lack of leadership or initiative is certainly not an implausible or fantastical justification for exercising a peremptory challenge.

Defendant also contends the trial court did not fulfill its duty. He asserts the court failed to make a sincere and reasonable attempt to evaluate the prosecutor's explanations and to express its findings. It only concluded summarily that the prosecutor's reasons were credible and not racially motivated. As a result, he argues, we need not defer to its ruling.

We disagree. "[W]hen ruling on a *Wheeler* motion, the trial court 'must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire

14

and has exercised challenges for cause or peremptorily . . . ." [Citation.]' [Citation.] But in fulfilling that obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's race-neutral reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom." (*People v. Reynoso, supra*, 31 Cal.4th at p. 919.)

The record shows the court made a sufficient attempt to evaluate the prosecutor's reasons for excusing Ms. F. and to express its findings. It was not required to make a detailed statement because the prosecutor's reasoning was plausible and supported by the record. This is especially so where the prosecutor excused the juror for an intangible factor such as a personality trait of lacking leadership. The court heard the prosecutor's reasons and found them to be genuine. It was thus not required to express its findings in the detailed manner sought by defendant.

We uphold the trial court's denial of defendant's *Batson/Wheeler* motion.

II

*Sufficiency of the Evidence*

Defendant contends insufficient evidence supports the jury's finding that he attempted to kill Stowers willfully, deliberately, and with premeditation. He asserts the only reasonable inference to be drawn from the evidence is that he made an immediate and spontaneous decision to chase Stowers after Stowers pulled him off of Nguyen.

"In assessing the sufficiency of the evidence supporting a jury's finding of premeditated and deliberate murder [or attempted murder], a reviewing court considers the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a rational trier of fact could find the defendant guilty beyond a

15

reasonable doubt.  (*People v. Burney* (2009) 47 Cal.4th 203, 253; *People v. Perez* (1992) 2 Cal.4th 1117, 1124.)  When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment.  (*Burney*, at p. 253; *Perez*, at p. 1124.)

" ' "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) " 'Premeditation and deliberation can occur in a brief interval.  "The test is not time, but reflection.  'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' [Citation.]" [Citations.]' (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

"In *People v. Anderson* (1968) 70 Cal.2d 15, we [the Supreme Court] identified three types of evidence—evidence of planning activity, preexisting motive, and manner of killing—that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation.  (*People v. Solomon, supra*, 49 Cal.4th at p. 812.)  We have made clear, however, that ' "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." [Citations.]' [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069.)

Applying the *Anderson* factors, we conclude sufficient evidence supports the jury's finding that defendant attempted to kill Stowers willfully, deliberately, and with premeditation.  Upon seeing the group of coworkers, defendant asked Felix, "Are those the guys?"  After Felix confirmed they were, defendant attacked Nguyen by hitting him in the head.  Stowers and Jacobson got defendant off of Nguyen by taking him to the ground and kicking him.  Then, when defendant stood up, he did not retreat or stop his

16

pursuit. Instead, he brandished a knife, chased Stowers across the street, pushed him down from behind, came upon him against a wall, and tried to stab him repeatedly. Stowers told defendant to stop trying to stab him, and he held onto defendant's wrist to prevent being stabbed. Despite these efforts, defendant stabbed Stowers in the torso.

This evidence supports the jury's finding. It shows defendant planned for the attack. He brought a knife to the scene and intentionally hit Nguyen after Felix confirmed the coworkers' identities. He also chased Stowers when the latter was retreating. The evidence also shows defendant had a motive to attack Stowers. He wanted to attack the men based on Felix's experience at the bar, and he wanted to avenge Stowers's ending the attack on Nguyen and throwing defendant to the ground. And the manner in which defendant attempted to kill Stowers shows he sought to kill deliberately and with premeditation. He chased Stowers across the street, pushed him down, and repeatedly attempted to stab him before he succeeded. During this sequence of events, defendant had sufficient time to premeditate and deliberate what he would do. Stowers even restrained him for a moment in which he could have stopped the attack, but he did not stop. The evidence is sufficient to support the jury's finding.

### III

*Modification of Judgment*

Defendant contends the trial court imposed an unauthorized sentence on his attempted murder conviction. The court imposed a prison term of seven years to life, doubled to 14 years due to a strike prior, as required by section 3046 and the "Three Strikes" law (§ 667, subds. (b)-(i)). Defendant contends the correct sentence under section 664, subdivision (a) "is life with the possibility of parole, not seven (or 14) years to life. . . . [T]he correct sentence is life with a minimum parole eligibility term of 14 years, not 14 years to life." He asks us to modify the sentence accordingly. We conclude the trial court did not err.

17

The Supreme Court has rejected defendant's argument in light of the Three Strikes law and the determinate sentencing law (§ 1170): "A statute requiring a prisoner to serve a specified term of incarceration before being released on parole is a provision requiring service of a 'minimum term' within the sentence-doubling language of section 667[, subdivision] (e)(1). As we have pointed out, under the current sentencing scheme the parole release date marks the end of the prison term. Because section 3046 requires that a defendant sentenced to life imprisonment with the possibility of parole serve 'at least seven calendar years or . . . a term as established pursuant to any other section of law that establishes a [greater] minimum period of confinement' before becoming eligible for parole, it sets forth a 'minimum term' within the meaning of section 667[, subdivision] (e)(1), which provides that for a defendant with a prior strike the 'minimum term for an indeterminate term shall be twice the term otherwise provided as punishment for the current felony provision.'

"Defendants insist that the sentence for attempted premeditated murder does not have a minimum term, because section 664, the relevant penalty provision, does not mention service of any minimum term, stating only that the punishment is 'imprisonment in the state prison for life with the possibility of parole.' But as we have explained, the minimum term for a defendant found guilty of attempted premeditated murder is found not in section 664 but in section 3046. The parole ineligibility period set by section 3046 *is* a minimum term within the sentence-doubling language of section 667[, subdivision] (e)(1)." (*People v. Jefferson* (1999) 21 Cal.4th 86, 96, original italics.)

Defendant correctly notes a straight life term is an indeterminate term (*People v. Felix* (2000) 22 Cal.4th 651, 659), but, as the *Jefferson* court held, the legislative addition of a minimum term does not change the character of the indeterminate term to something other than an indeterminate term, as that term is now used in California sentencing. Under *Jefferson*, the trial court correctly sentenced defendant to a prison term of 14 years to life for the attempted premeditated murder.

18

IV

*Sentencing and Clerical Errors*

Defendant raises three errors regarding his conviction and sentence for assaulting Nguyen by means of force likely to produce great bodily injury (count three). Each requires correction, and we will direct the trial court to make those corrections.

First, in its minute order, the trial court noted the jury found true the personal use of a dangerous weapon enhancement alleged as to defendant's assault on Nguyen. The jury actually found the alleged enhancement not true. We have inherent power to direct the trial court to correct this error. (*In re Candelario* (1970) 3 Cal.3d 702, 705.)

Second, because the jury found the dangerous weapon enhancement not true, the assault against Nguyen no longer qualified as a "serious felony" for purposes of imposing a five-year enhancement under section 667, subdivision (a). (*People v. Haykel* (2002) 96 Cal.App.4th 146, 151; § 245, subd. (a)(4).) Nonetheless, the trial court imposed the enhancement. We order it stricken.

Third, the abstract of judgment describes count three as "Assault w/deadly weapon not firearm." Obviously, that is an incorrect description, as the jury, by rejecting the personal use weapon enhancement, found him guilty of assaulting Nguyen by means likely to produce great bodily injury, as charged in the information, not with a deadly weapon. We direct the court to amend the abstract.

V

*SB 1393*

Prior to 2019, trial courts had no authority to strike a serious felony prior that is used to impose a five-year enhancement under section 667, subdivision (a)(1). SB 1393 removed this prohibition. (Stats. 2018, ch. 1013, §§ 1, 2.) The legislation became effective January 1, 2019. (Cal. Const., art. IV, § 8, subd. (c).)

19

Defendant contends SB 1393 applies to him because the statute is retroactive and applies to all cases not yet final as of its effective date, such as this case. He asks us to remand so the trial court may exercise its new discretion and consider striking the felony prior used to impose the five-year enhancement on count one, his conviction for attempted murder.

The Attorney General agrees SB 1393 is retroactive, but he argues we should not remand because the trial court's statements on the record clearly indicate it would not in any event have stricken the prior when it originally sentenced defendant. We agree with the Attorney General.

Absent evidence to the contrary, amendments to statutes that reduce the punishment for a crime or vest in trial courts the discretion to impose a lesser penalty, such as SB 1393, apply to all defendants whose judgments are not final as of the amendment's effective date. (*In re Estrada* (1965) 63 Cal.2d 740, 742; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972.) When it enacted SB 1393, the Legislature did not indicate it intended the legislation to apply prospectively only. (*Ibid.*) The act thus applies retroactively to this case.

That finding is not the end of the matter. We are not required to remand to allow the court to exercise its discretion if "the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement" even if it had the discretion. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so. Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been. (See *People v. McVey* (2018) 24 Cal.App.5th 405, 419 [no remand where, "[i]n light of the trial court's express consideration of the factors in aggravation and mitigation, its pointed comments on the record, and its deliberate choice of the highest possible term for the

firearm enhancement, there appears no possibility that, if the case were remanded, the trial court would exercise its discretion to strike the enhancement altogether"]; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 [case not remanded for resentencing even though court did not expressly state it would not have stricken a strike prior but indicated in statements and rulings that it would not exercise any discretion to reduce the sentence, regardless of the particular enhancement at issue].)

Reviewing the evidence in the record, we conclude there is no possibility the trial court would strike the enhancement were we to remand. At sentencing, the court first denied defendant's motion for new trial. Independently reviewing the evidence, the court felt "very comfortable denying the motion for new trial [and] very comfortable with the verdict . . . including that the defendant had adequate time to premeditate the attempted murder of Mr. Stowers." The evidence showed defendant "was doing his reconnaissance and essentially laying [*sic*] in wait . . . ."

Defendant's behavior after Stowers threw him down was "rage, and he did not like what Mr. Stowers had done unto him and was going to make that clear under whatever circumstances that might be including, incredibly, chasing him out into oncoming traffic on J Street that night, dodging in and out of cars . . . and then not giving up . . . ." There was no question that after cornering Stowers, defendant stabbed him.

The court found defendant had "ample opportunities . . . to reflect on how far was he going to take this when it came to Mr. Stowers. Well, you take it all the way. Incredibly. Senselessly. [¶] This whole case just shows the absurdity of what's deemed to be at times acceptable societal behavior over something as ridiculous as to the caliber of a Long Island Iced Tea drink. That's what brought us here today."

During sentencing, the prosecutor explained the facts of the felony prior. Defendant was convicted of attempted manslaughter for stabbing his ex-wife numerous times. Defendant served 10 years in prison for that conviction and had been released

only for a few months when he stabbed Stowers. Defendant did not know any of the individuals at the bar before he attacked.

Upon sentencing defendant, the court stated, "I've already, I guess, sort of spoken my sense of this case in my ruling on the new trial motion. This gives me obviously, as you know, great satisfaction in imposing the very lengthy sentence here today." The court noted that, notwithstanding defendant's genial conduct during court proceedings, his actions had displayed a "temper" that was "oftentimes triggered by drinking," along with "a [penchant] to use knives, apparently." The court stated defendant had "earned the sentence here today."

The court imposed a prison term of 14 years to life, plus a consecutive 22 years. On the conviction for assault likely to produce great bodily injury, the court imposed the upper term of four years, doubled for the prior strike. The court explained there was "no shortage" of aggravating factors that supported the upper term, but one factor "certainly to include [was] this case did involve planning and sophistication and there was violent conduct involved and the Defendant . . . has served a prior prison term."

The assault count was the only count on which the court could have exercised leniency in sentencing, but it did not. It could have imposed terms of two, three, or four years. (§ 245, subd. (a)(4).) Yet, despite having already imposed a term of life with parole, the court imposed the upper term, knowing that when doubled, the term would add two additional years to defendant's sentence over what he would have served had the court imposed the mid term.

From this evidence, we conclude the trial court would not have dismissed defendant's prior serious felony even if it had discretion to do so. (See *People v. McDaniels*, *supra*, 22 Cal.App.5th at p. 425; accord, *People v. McVey*, *supra*, 24 Cal.App.5th at p. 419.)

Defendant contends we cannot know how the trial court would exercise its discretion on remand because trial counsel had no basis to argue in favor of striking the

felony prior.  He cites *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110-1111, where the court stated, "[S]peculation about what a trial court might do on remand is not 'clearly indicated' by considering only the original sentence."

Our review of the record, however, goes beyond the original sentence.  Besides not exercising its discretion for leniency when it could have, the trial court made clear its intention to impose the most stringent sentence it could justifiably impose.  It stated there was no doubt the verdict was correct, defendant's actions were premeditated, dangerous, senseless and absurd, he attempted to kill Stowers only a few months after being released from prison where he had been for 10 years, and the court took "great satisfaction" in imposing the "very lengthy sentence" it imposed.  Under these circumstances, we are confident the court would not strike the felony prior and its resulting enhancement out of leniency toward defendant.  We will not remand the matter for resentencing on the enhancement imposed under section 667, subdivision (a)(1), on count one, the attempted murder conviction.

## DISPOSITION

We remand the matter to direct the trial court to take only the following actions: (1) correct its minute order of November 20, 2014, to state the jury found the personal use of a dangerous weapon allegation as to count three to be not true; (2) strike the five-year prior serious felony enhancement imposed on count three under section 667, subdivision (a); (3) amend the abstract of judgment to describe count three as "assault likely to produce great bodily injury" and to state defendant's corrected sentence; and (4) forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


      HULL      , Acting P. J.


We concur:


      BUTZ      , J.


      MAURO      , J.

Filed 2/15/19

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C078623 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F07431) |
| v. | ORDER OF PARTIAL PUBLICATION |
| CORNELIUS L. JONES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Lawrence G. Brown, Judge. Remand and affirmed as modified.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Jeffrey Grant and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I through IV.

25

THE COURT:

The opinion in the above-entitled matter filed on January 28, 2019, was not certified for publication in the Official Reports. For good cause it now appears that Part V of the Discussion should be published in the Official Reports and it is so ordered.

BY THE COURT:


_____HULL_____, Acting P. J.


_____BUTZ_____, J.


_____MAURO_____, J.

26